**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **ATLANTA ALLERGY AND ASTHMA CLINIC, P.A.,** | |
| **Plaintiff,** | |
| **v.** | **1:08-cv-3033-WSD** |
| **ALLERGY & ASTHMA OF ATLANTA, LLC; MAZIAR REZVANI, M.D.; and LUQMAN SEIDU, M.D.,** | |
| **Defendants.** | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff Atlanta Allergy and Asthma Clinic, P.A.'s ("Plaintiff") Amended Motion for Summary Judgment [83], on Defendant Allergy & Asthma of Atlanta, LLC's ("Defendant") Motion for Partial Summary Judgment [91], Defendant's Motion in Limine to Exclude Plaintiff's Evidence of a Consumer Survey [88], Defendant's Motion in Limine to Exclude Dr. Kenneth L. Bernhardt as an Expert Witness for Plaintiff [89], and on Defendant's Motion to Strike Notice of Filing [133].

# I.     BACKGROUND

This case is principally a trademark dispute between Plaintiff Atlanta Allergy and Asthma Clinic, P.A. and Defendant Allergy & Asthma of Atlanta, LLC.  Plaintiff claims the exclusive right to use the mark "Atlanta Allergy & Asthma Clinic," and that Defendants' name infringes upon the mark.

Both parties provide allergy and asthma services in Georgia.  Plaintiff has used the mark "Atlanta Allergy & Asthma Clinic," since 1996.[1]  Plaintiff contends it is the largest allergy and asthma practice in the Southeastern United States and is one of the largest in the United States, with nineteen (19) office locations in the Atlanta area.  Plaintiff further contends it has spent significant amounts of money to advertise, publicize, and promote its services, which has resulted in patients, referring physicians, and other members of the public identifying Plaintiff's mark exclusively with Plaintiff's medical services.[2]

Plaintiff employs the Spizman Agency as a Public Relations Consultant to facilitate the branding of its mark through community and media exposure.

---

[1] Plaintiff contends it used the mark "Atlanta Allergy Clinic" from at least 1972 until 1996, when it added the word "Asthma" to its mark.  Defendants dispute this chronology and assert that Plaintiff, as a legal entity, was not formally organized in Georgia until 1999 and that Plaintiff's practicing physicians used other iterations of its name during the period from 1972 through 1996.

[2] Plaintiff claims that it spent approximately $ 1,846,563.00 on the advertising and promotion of its mark since 1996.

Plaintiff's physicians have been featured in numerous media outlets regarding topics specific to allergy and asthma.[3] Plaintiff also claims it has distinguished and branded its mark with the creation and reporting of its daily "Pollen Count." During the pollen season, Plaintiff measures pollen particles per cubic meter at its research facility and provides this data to media outlets. Plaintiff contends it is the only certified pollen reporting station in the Atlanta area. Plaintiff argues that as a result of its efforts, including its pollen count service, Plaintiff's name is specifically associated with its allergy and asthma services, its medical research, and its physicians.

In late 2007, Defendants began using the name "Allergy & Asthma of Atlanta" to identify and advertise their allergy and asthma services in Georgia.[4] Plaintiff asserts that Defendants' use of the phrase "Allergy & Asthma of Atlanta" is causing actual confusion as to whether Defendants are affiliated with, authorized by, or otherwise related to Plaintiff.

---

[3] Plaintiff claims its physicians have been featured by the Associated Press, CNN Headline News, CNN Housecalls, Fox News, CBS Evening News with Katie Couric, Delta Sky Magazine, USA Today, Georgia News Network, WGST-AM 640, TIME, Self Magazine, Parents Magazine, and The Weather Channel.

[4] The individual Defendants, Maziar Rezvani, M.D., and Luqman Seidu, M.D., are the co-founders and sole owners of Defendant Allergy & Asthma of Atlanta, LLC.

Plaintiff further alleges that Defendants copied word-for-word a portion of Plaintiff's website and used that copyrighted material on Defendants' own website. Defendants admit this copying. Plaintiff contends that as a result of this plagiarism, Defendants falsely represented that they were a "premier facility in the Southeast for the treatments of allergy, asthma, and immunologic diseases."

Plaintiff brings this action for trademark infringement, unfair competition, and copyright infringement. Both parties move for summary judgment on all counts.

## II.    DISCUSSION

### A.    Standard on Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary

verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotations omitted).

B.    Trademark Infringement

The Lanham Act provides protections to trademarks and service marks. A plaintiff can establish trademark infringement by showing that "its mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1307 (11th Cir. 1998) (citing Burger King Corp. v. Mason , 710 F.2d 1480, 1491 (11th Cir. 1983)); accord 15 U.S.C. § 1114(1)(a) (prohibiting the "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive").

To prevail in a trademark infringement action, a plaintiff must show three things: first, that it was the first to use the trademark in the same market; second, that its mark is valid; and third, that the defendant's use of the contested mark is likely to confuse consumers. Dieter v. B & H Indus. of S.W. Fla., Inc., 880 F.2d 322, 326 (11th Cir. 1989); Burger King Corp. v. Mason, 710 F.2d 1480, 1491 (11th

Cir. 1983). Here, it is undisputed that Plaintiff used its mark, "Atlanta Allergy and Asthma Clinic," since at least 1996 and that Defendants did not begin using their name until 2007. At issue is whether "Atlanta Allergy & Asthma Clinic" is a valid mark and whether Defendants' use of "Allergy & Asthma of Atlanta" is likely to confuse consumers.

1.   *Validity of Mark*

To be entitled to trademark protection, a mark must be valid and distinctive. Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176 (11th Cir. 1985). A Court may not reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant protection. Blau Plumbing, Inc. v. S.O.S. Fix-it, Inc., 781 F.2d 604, 610 (7th Cir. 1986). The strength and distinctiveness of the plaintiff's mark is a vital consideration in determining the scope of protection it should be accorded. John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 973 (11th Cir. 1983).

In ascending order of strength, there are four categories of distinctiveness in classifying a mark: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). Suggestive, arbitrary and fanciful marks, because their intrinsic nature serves to

indentify a particular source of a product, are deemed inherently distinctive and

thus are entitled to protection.[5]  Id.

Here the parties do not dispute that Plaintiff's mark, "Atlanta Allergy &

Asthma Clinic," is geographically descriptive.[6]  A descriptive mark is entitled to

---

[5] A generic mark is one which suggests the basic nature of the service.  See, e.g.,
Investacorp, Inc. v. Arabian Investment Banking Corp., 931 F.2d 1519, 1522-23
(11th Cir. 1991) (the term "Milk Delivery" is an example of a generic service mark
for a hypothetical milk delivery service).  A generic mark is incapable of achieving
trade name protection.  2 J. Thomas McCarthy, Trademarks and Unfair
Competition §12.01[1] (4th ed.2003).  Protection for generic marks would unfairly
prevent competitors from describing their goods and services.
    A descriptive mark identifies a characteristic or quality of a product or
service, such as its intended use, ingredients, dimensions, or desirable features.
See, e.g., Investacorp, 931 F.2d at 1522-23 ("Barn Milk" is a descriptive term).
Descriptive marks include marks that are simply descriptive, laudatorily
descriptive, and geographically descriptive.  A term that is likely to be perceived
by prospective purchasers as merely descriptive of the nature, qualities, or other
characteristics of the product or service, or as a mere geographical description of
the origins of the goods or services, or as the personal name of a person connected
with the goods or services, is not inherently distinctive.  Restatement (Third) of
Unfair Competition §14.  A descriptive term is not automatically protectable, but it
may achieve that status once it has acquired a secondary meaning.  Ice Cold Auto
Air of Clearwater, Inc. v. Cold Air & Accessories, Inc., 828 F. Supp. 925, 931
(M.D. Fla. 1993).
    A suggestive mark suggests some characteristic of the product or service to
which it is applied, but requires the consumer to use his imagination to determine
the nature or the product or service.  John H. Harland Co., 711 F.2d at 974.  An
arbitrary or fanciful mark bears no relationship to the product or service with
which it is associated.  Id.

[6] "To determine if a mark is geographically descriptive, one should ask whether the
mark is the name of the place or region from which the goods actually come.  If the
answer is yes, then the geographic term is probably used in a descriptive sense, and

protection only if it has acquired secondary meaning.  <u>Ice Cold Auto Air of</u>

<u>Clearwater, Inc. v. Cold Air & Accessories, Inc.</u>, 828 F. Supp. 925, 931 (M.D. Fla.

1993); <u>see also</u> 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair</u>

<u>Competition</u> § 14:1 (4th ed. 2003) (geographically descriptive marks are a subset

of descriptive marks and are treated like other descriptive marks).

Secondary meaning is the connection in the consumer's mind between the

mark and the provider of the product or service.  <u>Investacorp, Inc. v. Arabian</u>

<u>Investment Banking Corp.</u>, 931 F.2d 1519, 1525 (11th Cir. 1991).  To prove

secondary meaning, the plaintiff must demonstrate that "the primary significance

of the term in the minds of the consuming public is not the product but the

producer."  <u>Vision Ctr. v. Opticks, Inc.</u>, 596 F.2d 111, 118 (5th Cir. 1979).  A high

degree of proof is necessary to establish secondary meaning for a descriptive term

which suggests the basic nature of the product or service.  <u>American Telev. &</u>

<u>Communic. Corp. v. American Communic. & Telev., Inc.</u>, 810 F.2d 1546, 1549

(11th Cir. 1987).  Secondary meaning exists if a substantial number of existing or

prospective customers understand the designation when used in connection with a

business to refer to a particular person or enterprise.  <u>Perini Corporation v. Perini</u>

_____

secondary meaning is required for protection."  <u>Gulf Coast Commercial Corp. v.</u>
<u>Gordon River Hotel Assocs.</u>, 2006 WL 1382072, * 6 (M.D. Fla. 2006) (internal
quotations and citations omitted).

Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990).  If a mark has not acquired

secondary meaning, the purchaser will not make an association with a particular

producer and thus will not be misled by an identical or similar mark.  Thompson

Medical Co., Inc. v. Pfizer, Inc., 753 F.2d 208, 216 (2d Cir. 1985).  A plaintiff

must show that its mark acquired secondary meaning before the alleged

infringement began.  Investacorp, 931 F.2d at 1525.

A plaintiff may prove secondary meaning by a variety of methods.  The

following factors are relevant to a secondary meaning inquiry: (1) the length and

manner of use; (2) the nature and extent of advertising and promotion; (3) the

efforts made by plaintiff to promote a conscious connection with the public's mind

between the name and plaintiff's product; and (4) the extent to which the public

actually identifies the name with plaintiff's product.  Investacorp, 931 F.2d at 1525

(citing Conagra v. Singleton, 743 F.2d 1508, 1513 (11th Cir.1984)).  Although

secondary meaning may be proved by customer survey evidence, a survey is not

required.  See Aloe Creme Labs., Inc., v. Milsan, Inc., 423 F.2d 845, 849 (5th Cir.

1970), cert. denied, 398 U .S. 928 (1970).  Whether or not a mark has acquired

secondary meaning is a question of fact.  2 McCarthy § 15:29.  On a motion for

summary judgment where secondary meaning is an issue, the motion must be

denied where a genuine factual dispute as to secondary meaning exists.  Id.

i.    <u>Analysis</u>

The Court examines whether Plaintiff's mark has acquired secondary meaning such that it is valid and protectable.

**(1)    Length and manner of use**

Plaintiff contends that it has used the mark "Atlanta Allergy & Asthma Clinic," or a variation, since 1972.  Although Defendants dispute the length of Plaintiff's use of its mark, it is undisputed that Plaintiff used its mark since 1996.[7] Plaintiff argues that it used its mark consistently in its advertising, in the media, and at community outreach events in connection with Plaintiff's services, and that such use has been adequately extensive to establish secondary meaning.

Defendants claim that more than 20,000 businesses use the word "Atlanta" in their names, 135 of which are medical practices, and that eight (8) allergy and asthma practices in Atlanta use the terms "Allergy" and "Asthma" in their names. Defendants argue that Plaintiff cannot show exclusive use of its mark, noting that

_____

[7] Defendants dispute Plaintiff's use of its mark from 1972 to 1996.  During those years, Plaintiff used the mark "Atlanta Allergy Clinic," which Plaintiff contends is substantially similar and a legal equivalent.  If the new and old forms of a trademark "create the same, continuing commercial impression," the use of the two marks is "tacked" together.  <u>See</u> <u>McCarthy</u> § 17:26; <u>American Sec. Bank v. American Sec. & Trust Co.</u>, 571 F.2d 564, 566 (Cust. & Pat. App. 1978).  Plaintiff contends that its continuous use of its current mark from 1996 to the present is a sufficient length of use to establish secondary meaning.

in 1999, the Atlanta ENT Allergy and Asthma Associates, P.C., another allergy

and asthma specialist in Atlanta, opened using in its name all the words shared by

Plaintiff's and Defendant's names.[8]

Defendants' attempt to deconstruct the words of Plaintiff's name is

unavailing. The validity of a mark is tested by looking at the mark as a whole, not

its individual components. See 2 McCarthy §11:27; see also Popular Bank of

Florida v. Banco Popular de Puerto Rico, 9 F. Supp. 2d 1347, 1357 (S.D. Fla.

1998).[9] However, there is no bright-line test for an amount of time a mark must be

used to acquire secondary meaning. 2 McCarthy § 15:54. While it is undisputed

Plaintiff has used its mark since 1996, the Court cannot conclude on summary

judgment that the length and manner of Plaintiff's use, standing alone, establishes

that it acquired secondary meaning.

---

[8] Plaintiff contends that Atlanta ENT Allergy and Asthma Associates, P.C.,
changed its name in response to a cease and desist letter from Plaintiff, and that it
no longer does business under an infringing name.

[9] Plaintiff correctly notes that third-party usage of individual terms in a mark may
help a court classify the mark as descriptive (rather than generic, suggestive, or
arbitrary). Third-party usage of individual terms is not, however, relevant to the
assessment of whether a descriptive mark is entitled to protection. Rather the
analysis at this stage focuses on whether the mark, as a whole, has acquired
secondary meaning.

**(2)      Nature and extent of advertising and promotion**

Plaintiff contends that from 1996 to the 2006, the year before Defendant begin its operations, it spent approximately $1.4 million on the advertising and promotion of its mark.[10]

"[I]t is not the amount of money spent on advertising that is important, but the results achieved with the money spent." Bank of Texas v. Commerce Southwest, Inc., 741 F.2d 785, 788 (5th Cir. 1984).  Standing alone, a substantial advertising expenditure is not enough where it does not result in the public's identification of the mark with plaintiff's products or services.  The Court does, however, consider Plaintiff's expenditure in connection with the other factors for establishing secondary meaning.

**(3)      Efforts made to promote a conscious connection in the public's mind between the name and plaintiff's product**

Plaintiff points to its media coverage and community outreach events, which include annual Asthma Screenings and Asthma Education classes for the metropolitan Atlanta area on location at various corporations, and its participation in an annual Food Allergy Walk as evidence of its efforts to promote a connection in the public's mind between its name and its services.  Plaintiff argues that its

_____

[10] Defendants quibble that certain of this expenditure may not have been related to advertising.  The disputed amount appears to be less than $5,000.

name is now specifically associated with its allergy and asthma services, its medical research, and its physicians. Plaintiff also points to its Pollen Count service and contends that most of the media outlets that report Plaintiff's Pollen Count actually reference Plaintiff as the source of the data.[11] Plaintiff contends it receives hundreds of calls a year regarding the amount of pollen present on a given day. Finally, Plaintiff employs a consultant to build patient referrals for Plaintiff from existing and new referring doctors' practices.[12] Plaintiff argues this also creates a conscious connection between Plaintiff's mark and its services in the public's mind. Plaintiff contends that from November 2007 through January 2009, its consultant met with approximately 310 medical providers on behalf of Plaintiff and of those providers, only fourteen (14) were unfamiliar with Plaintiff or its services.

Defendants argue that Plaintiff's marketing to physicians' offices does not target the public or consumers and that there is no evidence that such efforts promoted a conscious connection in the minds of the consuming public between

---

[11] For example, The Weather Channel's website credits Plaintiff with providing the Pollen Count data.

[12] It is undisputed that Plaintiff's consultant spends over 80 hours a month meeting with and calling referring doctors' practices within the metropolitan Atlanta area on behalf of Plaintiff; that she meets with approximately 30 people per month associated with doctors' practices; and that the people with whom she meets decide where to refer allergy patients.

Plaintiff's claimed mark and its services.[13]  Defendants also argue that when

Plaintiff's physicians appear in various media outlets, including in print articles,

they are identified by their individual names in addition to their affiliation with

Plaintiff, and that while these appearances create potential exposure of Plaintiff's

mark to the public, Plaintiff's physicians do not necessarily discuss Plaintiff's

medical services in these media appearances.  Finally, Defendant argues that

Plaintiff's pollen count reporting is not a medical service provided by Plaintiff, and

that there is no evidence that Plaintiff's pollen count reporting promotes secondary

meaning.  Plaintiff replies that it is self-evident that its pollen count service is

inextricably intertwined with its medical services for allergies and asthma.

Plaintiff appears to have made substantial efforts to promote itself and the

services it provides.  Although the record does not demonstrate that all of

Plaintiff's efforts were necessarily geared toward this end, and Plaintiff's pollen

---

[13] Plaintiff responds that promotional efforts directed at persons other than end
consumers may contribute to establishing secondary meaning.  Plaintiff cites
Conagra, in which the Eleventh Circuit noted that a promotional film "widely
displayed to brokers and retailers in the seafood business for over three years
preceding the instant litigation" was an example of the plaintiff's conscious effort
to tie its name to its product.  743 F.2d at 1513.

count reporting arguably is a distinct service and not relevant to this analysis,[14] Plaintiff has established that it has made a concerted effort to promote its mark. Standing alone, this does not establish secondary meaning, but the Court considers this along with the other factors.

**(4)  Extent to which the public actually identifies the plaintiff's name with plaintiff's product**

In determining whether the public actually identifies a mark with the plaintiff's product or service, courts look for evidence that the plaintiff has achieved recognition for its name. Conagra, 743 F.2d at 1513. "Actual identification is best proved by surveys or other quantifiable proof, and, absent such data, it is very difficult to prove." Gulf Coast Commercial Corp. v. Gordon River Hotel Assocs., 2006 WL 1382072, * 10 (M.D. Fla. 2006).

Plaintiff offers the opinion of its expert, Kenneth L. Bernhardt, Ph.D., who designed a survey (the "Survey") to determine whether the relevant marketplace associates Plaintiff's name with its services. Plaintiff contends the Survey results showed that 73% of survey respondents made such an association. Dr. Bernhardt concludes that Plaintiff's mark has acquired a substantial level of awareness and recognition in the marketplace.

---

[14] See Gift of Learning Found., Inc. v. TGC, Inc., 329 F.3d 792, 801 (11th Cir. 2003) (questioning whether promotion of a specific event demonstrates promotion of a corporation's mark and its business).

Defendants argue that Dr. Bernhardt's conclusion is flawed because the Survey universe excluded all actual or potential allergy and asthma patients, and instead only surveyed referring physicians, who are not representative of the marketplace as a whole.

     i.     <u>Defendants' Motion to Exclude Plaintiff's Expert Survey and Opinion</u>

Defendants move, pursuant to Federal Rules of Evidence 402, 403, and 702 and the rule announced in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), to exclude Plaintiff's Survey.[15]

Defendants contend that the Survey should be excluded because (1) it did not survey any actual or potential consumers (*i.e.*, patients), only other physicians; (2) it did not test for an association between Plaintiff's claimed mark and a single source of allergy and asthma medical services; (3) it failed to follow accepted scientific principles and methods for survey evidence; and (4) contact between an employee of Plaintiff's counsel and possible survey respondents compromised the objectivity of the process.

Rule 702 of the Federal Rules of Evidence provides:

---

[15] Defendants also move, in the event the Court grants their motion to exclude Plaintiff's Survey, to exclude Dr. Kenneth L. Bernhardt as an expert witness. Because the Court finds that Plaintiff's survey evidence is admissible, Defendants' motion to exclude Bernhardt as an expert witness is denied.

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles
> and methods reliably to the facts of the case.

Fed. R. Evid. 702. The district court serves a gatekeeper function in determining

whether expert testimony is allowed under Rule 702. To perform its role as a

gatekeeper, the Court must consider whether (i) an expert is qualified to testify

regarding the matters he intends to address, (ii) the expert's methodology is

sufficiently reliable under <u>Daubert</u>, and (iii) the expert's testimony assists the trier

of fact to understand the evidence or to determine a fact in issue. <u>Quiet Tech. DC-

8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1340-41 (11th Cir. 2003).

<u>Daubert</u> sets forth a non-exclusive checklist for use in evaluating the reliability of

scientific expert testimony. The factors include: (1) whether the expert's technique

or theory can be or has been tested - that is, whether the expert's theory can be

challenged in some objective sense, or whether it is instead simply a subjective,

conclusory approach that cannot reasonably be assessed for reliability; (2) whether

the technique or theory has been subject to peer review and publication; (3) the

known or potential rate of error of the technique or theory when applied; (4) the

existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. Daubert, 509 U.S. at 593-94.

The Eleventh Circuit has held that alleged technical deficiencies in a survey presented in a Lanham Act action affect the weight to be accorded to the survey and not its admissibility. Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 844 (11th Cir. 1983).

Plaintiff's expert, Dr. Bernhardt, is a marketing professor and Special Assistant to the Dean at the Robinson College of Business at Georgia State University, where he has been a member of the faculty since 1972. He has experience with consumer research including serving as Consumer Research Advisor at the Federal Trade Commission. Dr. Bernhardt's publications include marketing and consumer behavior articles in peer reviewed journals and two marketing textbooks.

Here, the Survey that Dr. Bernhardt employed included the following questions:

1. When you think of medical practices specializing in the treatment of allergies, what is the name of the first practice that comes to mind? (IF SAY DOCTOR'S NAME ASK: Can you tell me the name of their practice?) What other medical practices specializing in the treatment of allergies can you name? (IF SAY DOCTOR'S NAME ASK: Can you tell me the name of

their practice?) [PROBE: What others?] [PROBE UNTIL
UNPRODUCTIVE] (RECORD EXACT NAMES OF PRACTICES)

2. I'm going to read you the names of several medical practices specializing in
   the treatment of allergies. The practices may or may not currently exist.  The
   list may include practices you mentioned.  For each one, please tell me if
   you are aware of or are not aware of that practice.  If you don't know or are
   not sure, simply say you don't know or are not sure.

Question 1 was the "unaided" portion of the survey.  Plaintiff's full or partial

name was defined as mentions of "Atlanta Allergy and Asthma Clinic," "Atlanta

Allergy and Asthma," "Atlanta Allergy," or "Atlanta Allergy Clinic."  Unaided

awareness of Defendants' full or partial name was defined as mentions of "Allergy

and Asthma of Atlanta," "Allergy Asthma of Atlanta," or "Allergies and Asthma

of Atlanta."  Using this criteria, unaided awareness of Plaintiff was 41% versus just

8% for Defendants.

Question 2 was the "aided" portion of the survey, in which six medical

practice names (Plaintiff's, Defendants', three other Atlanta-area practices, and a

"control") were presented in random order.  Rotations of the order of the names

presented to survey respondents were controlled to account for any order bias.

According to the Survey results, among Defendants' referring doctors, a

total of 73% were aware of Plaintiff's practice name as a source of allergy and

asthma services, compared to only 47% awareness of Defendants' practice name.

Based on these results, Dr. Bernhardt concluded that Plaintiff has a significant

level of secondary meaning in the Atlanta market and that Plaintiff's mark has acquired a substantial level of awareness and recognition in the marketplace.

The Court addresses each of Defendants' challenges to Plaintiff's Survey.

**(a)    Improper survey universe**

Defendant asserts that the Survey is not reliable because the universe of respondents was not properly defined.  Here, the sampling universe was Defendants' list of referring doctors provided by Defendants in discovery. Plaintiff states that the general allergy suffering public was not used because Defendants receive 85% of their patients from referrals from other doctors, and Defendants direct virtually all of their marketing toward other doctors to increase their referrals.  Plaintiff contends that by focusing only on Defendants' referring doctors, any bias in the Survey was in favor of Defendants and the results likely under-represent the true level of Plaintiff's secondary meaning in the market.

In assessing the reliability and relevance of survey evidence, the Court must determine whether the "universe" was properly defined.  <u>Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City</u>, 383 F.3d 110, 118-19 (3rd Cir. 2004) (citing 2 <u>McCarthy</u> § 32:159).  The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case.  <u>Id.</u>  "Even if the proper questions are asked in a proper manner, if the wrong persons are asked,

the results are likely to be irrelevant." McCarthy § 32:159; see Citizens Fin.
Group, 383 F.3d at 119. The former Fifth Circuit observed that in trademark
surveys "[t]he appropriate universe should include a fair sampling of those
purchasers most likely to partake of the alleged infringer's goods or services."
Amstar Corp.v. Domino's Pizza, Inc., 615 F.2d 252, 264 (5th Cir. 1980). "In a
traditional case claiming 'forward' confusion . . . the proper universe to survey is
the potential buyers of the junior user's goods or services." McCarthy § 32:159.

Defendants contend that Plaintiff's Survey is fatally flawed because it did
not survey any members of the consuming public, but only surveyed other
physicians, specifically fifty-one (51) doctors that had referred patients to
Defendants.

Plaintiff responds that it is proper to include those persons who assist
consumers in selecting the goods they wish to purchase, citing John H. Harland
Co. v. Clarke Checks, Inc., 711 F.2d 766, 979 n.22 (11th Cir. 1983) (noting it was
proper to consider the opinions of persons who assist consumers in selecting and
ordering the goods they wish to purchase). Plaintiffs also cite United States Surg.
Corp. v. Orris, Inc., 983 F. Supp. 963 (D. Kan. 1997) (holding it was proper to
survey surgeons even though the hospital would make ultimate purchasing
decision of surgical equipment); and SunAmerica Corp. v. Sun Life Assur. Co. of

Canada, 890 F. Supp. 1559, 1576 (N.D. Ga. 1994) (noting "survey reveals a remarkable amount of actual confusion among those professional salespeople most likely to understand important product and issuer distinctions").  Plaintiffs also note that "the universe is the segment of the population whose perceptions and state of mind are relevant to the issues in the case."  See McCarthy § 32:159.  "If the relevant buyer class consists of *both* dealers and ultimate consumers, then the state of mind of the dealers is obviously important."  Id. at § 15:46.  Plaintiffs argue that because Defendants received the majority of their patients from referring doctors, those doctors are the "consuming public" and are therefore the proper universe for a survey.

The Court does not find that Plaintiff's Survey universe is fatally flawed.  At issue is the question of whether Plaintiff's mark had become associated with Plaintiff's services in the mind of the consuming public.  Plaintiff argues that the relevant "consuming public" is the population of physicians that actually refer patients to medical specialists such as Plaintiff and Defendants.  Defendants have not provided any authority holding that defining the consuming public in this manner is *inherently* flawed or *necessarily* produces an unreliable result.  Indeed, the law appears contrary to Defendants' position.  When "the relevant market includes both distributors and ultimate purchasers, the state of mind of dealers is

important in determining if secondary meaning exists. While the fact that no ultimate consumers were surveyed may be relevant in determining the weight the survey should be given by the finder of fact, it does not render the . . . survey meaningless for determining if secondary meaning exists." <u>Thomas & Betts Corp. v. Panduit Corp.</u>, 138 F.3d 277, 295 (7th Cir. 1998).

While Defendants may argue that a survey of a broader universe may have produced different and more informative results, such argument goes to the weight Plaintiff's survey deserves, not to its admissibility. The Court is persuaded that Plaintiff's Survey is probative of the question of whether Plaintiff's name acquired secondary meaning.

### (b) Failure to test whether respondents indentified Plaintiff's mark with a single source of services

Defendants contend that Plaintiff's Survey is both unreliable and irrelevant because it only tested for brand awareness and failed to test whether the respondents actually associated Plaintiff's mark with a single source of medical services, as required to establish secondary meaning. To prove secondary meaning, a connection in the consumer's mind between the mark and the provider of the service must be demonstrated. <u>Investacorp</u>, 931 F.2d at 1525. Defendants contend that a survey result showing that Plaintiff was the party "most commonly associated" with the mark is not sufficient to show secondary meaning.

Plaintiff responds that the Survey asked about Plaintiff's name and therefore necessarily asked about the source of Plaintiff's services. Plaintiff also argues that brand awareness surveys have been accepted as a measure of secondary meaning. See, e.g., Sprinklet's Water Ctr., Inc. v. McKesson Corp., 806 F. Supp. 656, 661-62 (E.D. Mich. 1992) (considering results of brand awareness survey as evidence of secondary meaning); Loctite Corp. v. Nat'l Starch & Chem. Corp., 516 F. Supp. 190, 204-05 (S.D.N.Y. 1981) (describing brand awareness survey results as having greatest relevance to test of secondary meaning among various types of evidence).

The Court concludes that Plaintiff's Survey, which gathers evidence of awareness and familiarity of Plaintiff's name, is probative of the question of whether Plaintiff's mark has acquired secondary meaning.

### (c) Failed to follow objective criteria

Defendants object that Dr. Bernhardt was not objective in coding the Survey results and contend that he counted the words "Atlanta Allergy" as the equivalent of Plaintiff's mark. Defendants note that only two (2) out of fifty-one (51) respondents (*i.e.*, 3%) actually said "Atlanta Allergy and Asthma Clinic" in response to the unaided awareness question. When the word Clinic is disregarded, the total rises to eleven (11) out of fifty-one (51) (*i.e.*, 21.57%). Defendants object that in order to arrive at the 41% unaided awareness of Plaintiff's mark, Dr.

Bernhardt counted the claimed mark "Atlanta Allergy and Asthma Clinic," "Atlanta Allergy and Asthma" without the word Clinic, and the words "Atlanta Allergy."

Plaintiff responds that the decision to count a response as indicative of either Plaintiff or Defendant was based on the use of the unique elements of the name in the exact order of Plaintiff's mark and Defendant's name. Dr. Bernhardt further states his coding method is acceptable because Atlanta Allergy and Asthma Clinic is often referred to as "Atlanta Allergy."[16] Plaintiffs' observe that their internet website address is www.atlantaallergy.com. and that Plaintiff's physicians refer to themselves as "Atlanta Allergy." Plaintiffs also note that Dr. Bernhardt did not count every "Atlanta Allergy" response as a recognition of Plaintiff, but only included that response if the respondent also recognized Plaintiff's full name in the aided portion of the survey (where respondents were asked which names, from a list of six allergy practices, they recognized). If a respondent answered "Atlanta Allergy" in the unaided section but did not recognize Plaintiff in the aided portion, Dr. Bernhardt did not code that response for Plaintiff.

The Court is not persuaded, on the record presented, that Plaintiff's Survey failed to follow objective criteria or that it should be excluded on that basis.

---

[16] Defendants object that Dr. Bernhardt has only anecdotal evidence of such usage.

Defendants' objections go to the weight the Survey deserves, not to its admissibility.

**(d)    Lack of Objectivity**

Defendants object that a paralegal in the Plaintiff's counsel's office placed telephone calls to the offices of two of the potential survey respondents, potentially tainting the Survey results.  Plaintiff responds that the paralegal simply called to verify contact information for certain physicians on the list without disclosing any information about herself, her firm, or this litigation, and that Defendants only speculate, without any evidentiary basis, that the Survey results were tainted by this contact.  The Court concludes there is insufficient evidence to suggest that the Survey results were tainted, and it will not be excluded on that basis.

The Court concludes that Plaintiff's Survey, and the opinion testimony of Plaintiff's expert, Dr. Bernhardt, meets the requirements of Rule 702.  Dr. Bernhardt is qualified to testify regarding the secondary meaning Plaintiff's mark has acquired, his methodology is sufficiently reliable under Daubert, and his testimony will assists the trier of fact to understand the evidence or to determine a fact in issue in this case.  The Court also finds that this evidence is relevant and that its probative value outweighs any prejudicial effect it may have.  Defendants'

motion to exclude Plaintiff's Survey and expert witness opinion is thus required to be denied.

The Court continues analyzing the extent to which the public actually identifies Plaintiff's mark with its services.

In addition to its Survey, Plaintiff contends that a significant amount of actual confusion has occurred between the parties' marks since Defendants' practice opened. Direct evidence of actual confusion by customers is probative of the public's actual identification of marks. See Popular Bank, 9 F. Supp. 2d at 1358 ("if buyers are confused, then this also means that they must have recognized plaintiff's words as a trademark and associated it only with plaintiff"); see also Investacorp, 931 F.2d at 1526 ("instances of consumer confusion are probative of secondary meaning").

Plaintiff asserts that there have been between twelve (12) and twenty-five (25) instances of actual confusion in less than a year. Plaintiff contends in each of these instances, Defendants received telephone calls intended for Plaintiff, at least some of which were patients or potential patients. Plaintiff also states at least one patient had an appointment with Plaintiff, but mistakenly filled out the new patient forms from Defendants' website. Plaintiffs also claim least one employee at

another physicians' office mistakenly thought that Plaintiff's referral consultant was visiting on behalf of Defendants rather than Plaintiff.

Plaintiff further claims it receives hundreds of calls each year about its Pollen Count, and argues this illustrates that the public identifies Plaintiff's services with that information. Plaintiff additionally notes that during its consultant's 310 visits with existing and potential referring doctors' practices, only four (4) were actually unfamiliar with Plaintiff or its services.

Defendants argue that Plaintiff has not offered any evidence that any confused patient has ever actually sought or received services from Defendants. Defendants further argue that Plaintiff has not offered any evidence that any of the individuals calling Plaintiff about the pollen count were actual or potential consumers of Plaintiff's services. Finally, Defendants argue that evidence that referring physicians and other medical professionals are familiar with Plaintiff's services is irrelevant to the question of whether the consuming public associates Plaintiff's name with its services.[17]

Plaintiff has presented some evidence of confusion between its mark and Defendant's similar name. Especially in light of the disputed issue regarding the

---

[17] Defendants also argue that the evidence from Plaintiff's consultant regarding the familiarity of referring physicians with Plaintiff's services is inadmissible hearsay. Having reviewed Plaintiff's consultant's affidavit, the Court agrees.

weight to be accorded to Plaintiff's survey evidence, the Court is unable to conclude that summary judgment is appropriate. Whether the consuming public in fact associates Plaintiff's mark with its services is a fact-intense question and the facts here are in dispute. Telephone calls regarding Plaintiff's pollen count service may indicate an association in the mind of the public between Plaintiff's mark and its services, but may just as likely indicate nothing more than an association between Plaintiff's name and its pollen count, a service related to Plaintiff's medical services, but not a service for which Plaintiff and Defendants compete. Plaintiff's evidence that certain medical professionals are familiar with its name, to the extent such evidence is even admissible, is not conclusive on the question of whether Plaintiff's mark acquired secondary meaning among the consuming public.

Plaintiff has not established, on the record before the Court, that its mark has acquired secondary meaning. With disputed issues of material fact at issue, Plaintiff's motion for summary judgment is thus required to be denied. Because the evidence is disputed, Defendants' motion for summary judgment is likewise required to be denied.

Having concluded that Plaintiff failed to establish, on summary judgment, that it has a valid and protectable mark, the Court need not reach whether

Defendant's name is likely to confuse consumers.  The Court nonetheless

examines this issue and concludes that Plaintiff also has not established, on the

summary judgment record, a likelihood of confusion.

      2.    *Likelihood of confusion*

      The ultimate question, for purposes of determining liability in trademark

infringement actions, is whether there is a likelihood that consumers will be

confused about the relationship or affiliation between the plaintiff's products or

services and the defendant's products or services.  15 U.S.C. § 1125(a)(1)(A);

Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.3d 833, 839 (11th Cir. 1983).

Likelihood of confusion means probable confusion rather than mere possible

confusion.  Shatel Corp. v. Mao Ta Lumber & Yacht Corp., 697 F.2d 1352, 1356

n.2 (11th Cir. 1983).  The Eleventh Circuit has generally considered the following

factors in assessing likelihood of confusion: (1) the strength of the plaintiff's mark;

(2) the similarity of the design; (3) the similarity of the service; (4) the similarity of

service outlets and customers; (5) the similarity of advertising media used; (6) the

defendant's intent; and (7) any actual confusion.  Alliance Metals, Inc., of Atlanta

v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000).  In applying this test, no

single factor is dispositive,[18] but greater weight is given to the type of mark and evidence of actual confusion.  <u>Dieter</u>, 880 F.2d at 326; <u>Freedom Sav. & Loan Ass'n v. Way</u>, 757 F.2d 1176, 1186 (11th Cir. 1985).

      ii.    <u>Analysis</u>

Plaintiff argues that summary judgment is warranted because likelihood of confusion is conclusively established by: instances of actual confusion; the strength of Plaintiff's mark; the similarity of the marks; and the similarity of the parties' services.

**(a)    Instances of actual confusion**

As discussed above, Plaintiff contends there have been between twelve (12) and twenty-five (25) instances of actual confusion in less than twelve (12) months between Plaintiff's and Defendants' mark and services.

Defendant responds that Plaintiff has not provided any evidence that any confused patient has ever actually sought or received services from Defendant, noting that the majority of incidents of alleged confusion are telephone contacts, and not sales or other transaction, between unidentified third parties who called Defendants' office by mistake.  Defendant further argues that the one instance of alleged actual confusion on which Plaintiff relies involved one of Plaintiff's

---

[18] The Court need not analyze each factor to make a finding of likelihood of confusion.  <u>Ambrit, Inc. v. Kraft, Inc.</u>, 812 F.2d 1531, 1538 (11th Cir. 1986).

patients who arrived at Plaintiff's office, and, according to Defendants, was clearly not confused between the two practices. Although this patient mistakenly downloaded the wrong forms from Defendants' website, Defendant contends this is not sufficient to show the patient was actually confused.

The Court already concluded that the record evidence of actual confusion is disputed and that neither party is entitled to a finding on this factor on summary judgment.

**(b)    Strength of Plaintiff's mark**

The strength of a mark is evidence of a likelihood of confusion.  See Dieter, 880 F.2d at 326.  As discussed above, the Court is unable to conclude, on the record on summary judgment, that Plaintiff has established its mark has acquired secondary meaning.  Absent a finding that Plaintiff's descriptive mark has acquired secondary meaning, the Court cannot conclude that Plaintiff's mark is strong enough to contribute to a finding of a likelihood of confusion.

**(c)    Similarity of the marks**

Plaintiff contends that its mark, Atlanta Allergy & Asthma Clinic, is confusingly similar to Defendant's name, Allergy and Asthma of Atlanta.  Whether two marks are similar is essentially a subjective test.  "The similarity of design is determined by considering the overall impression created by the mark[s] as a

whole rather than simply comparing individual features of the marks." <u>John H. Harland Co. v. Clarke Checks, Inc.</u>, 711 F.2d 966, 975 (11th Cir. 1983) (quoting <u>Exxon Corp. v. Texas Motor Exchange, Inc.</u>, 628 F.2d 500, 504-05 (5th Cir. 1980).

The Court finds Plaintiff's mark and Defendants' name to be sufficiently similar to support a finding of likelihood of confusion.

**(d)     Similarity of the parties' services**

Both parties provide medical services for asthma and allergies in the Atlanta area and the parties do not dispute that their services are similar for the purposes of analyzing this factor.

Potentially weighing in favor of a finding of likelihood of confusion are the instances of actual confusion, the similarity of the marks, and the similarity of the parties' services. Absent a finding that Plaintiff has a strong mark, and in light of the factual disputes regarding the instances of actual confusion, however, the Court cannot make a finding on summary judgment of a likelihood of confusion.

3.     *Weakness of Plaintiff's Mark*

Defendants move for summary judgment, arguing that Plaintiff's mark is so weak, only the exact mark is entitled to protection. Defendants parse the words of Plaintiff's mark and argue that without "Atlanta," the remainder–"Allergy & Asthma Clinic"—would be generic and not afforded any protection. Defendants

then argue there is a high degree of third-party usage of the terms constituting Plaintiff's mark, noting that over 22,000 businesses have the word "Atlanta" in their name, that 10,000 of those use it as the first word, and that 135 medical practices use the word somewhere in their name. Defendants argue that third party usage of the words that constitute Plaintiff's mark demonstrate how necessary these words are for any business in the field wishing to inform the public about the services it provides and that it is located in Atlanta. Defendants argue that if Plaintiff's mark is entitled to protection at all, it is limited to the exact wording of its name and that even a slight variation is sufficient to avoid a claim of infringement. Defendants contend that because their name omits the word "Clinic" and places "Atlanta" at the end, rather than at the beginning, of the name, it does not infringe Plaintiff's claimed mark.

Defendants rely on Sun Banks of Florida, Inc. v. Sun Federal Sav. and Loan Ass'n, 651 F.2d 311 (11th Cir. 1981) for this approach. In that case, the court recognized that a finding that a mark is "arbitrary" is not necessarily a finding that it is entitled to absolute protection. Id. at 316. The court then found that extensive third-party use of the word "Sun" was evidence that there would be no likelihood of confusion between two businesses named Sun Banks and Sun Federal. Id. Whether a variation or alteration of a mark would likely cause confusion depends

on the "strength of the main part of the mark and the distinctiveness of the additional feature. Where a trademark is itself weak, minor additions may effectively negate any confusing similarity." Id. (citation omitted).

Defendant argues Plaintiff's mark is so weak that re-ordering its constituent terms will not confuse consumers. Whether Plaintiff's mark is weak depends on whether it has acquired secondary meaning. Whether Defendant's name is likely to cause confusion is a disputed factual question.[19] Viewing the facts in the light most favorable to Plaintiff, the Court cannot resolve either question on summary judgment, and Defendants' motion is required to be denied.

C.      Copyright Infringement

Plaintiff asserts, and Defendants admit, that a portion of the text on Plaintiff's website was copied and published on Defendants' website. It is undisputed that Defendants removed the infringing material on January 12, 2009. It is also undisputed that Plaintiff did not register a copyright in its website until January 13, 2009. Plaintiff moves for summary judgment on its copyright infringement claim. Defendant moves for summary judgment on the availability of damages.

---

[19] Plaintiff proffers both its survey evidence and instances of actual confusion.

Owners of copyrights have exclusive rights to reproduce copyrighted works and distribute copies of the copyrighted work to the public. 17 U.S.C. § 106(1), (3). To prove copyright infringement, plaintiffs must show that they are entitled to enforce the copyrights at issue and that the defendant copied or distributed the copyrighted works without authorization. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991); Calhoun v. Lillenas Publ'g, 298 F.3d 1228, 1232 (11th Cir. 2002). A copyright infringer is liable for either the copyright owner's actual damages and any additional profits of the infringer, or for statutory damages. 17 U.S.C. § 504. "[T]he plaintiff copyright owner must have registered the copyright prior to the infringement in order to obtain statutory damages." Cable/Home Communications Corp. v. Network Prods., Inc., 902 F.2d 829, 850 (11th Cir. 1990); see also 17 U.S.C. § 412.

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

Defendants argue that because Plaintiff did not register its copyright until after the offending text was removed from its website, Plaintiff is limited to actual

damages. Defendants further argue that because Plaintiff has admitted it has no evidence of any damages resulting from Defendants' infringement and because Defendants had no profit in 2008, no damages are available on Plaintiff's copyright claim.

1.    *Analysis*

The parties do not dispute that Defendants are liable for infringing Plaintiff's copyright. Plaintiff's motion for summary judgment on this claim is granted. The parties do dispute the damages available. Because Plaintiff did not register its copyright until after Defendants' infringement occurred, statutory damages are not available. 17 U.S.C. § 412. Plaintiffs have not offered any evidence of actual damages resulting from Defendants' infringement. The only measure of damages left to Plaintiff is Defendants' profits attributable to the infringement. 17 U.S.C. § 504(b).

Plaintiff has presented proof of Defendants' gross revenues, but has failed to present any evidence of the revenue, if any, attributable to Defendants' infringement. Defendants are accordingly relieved of the burden of proving any deductible expenses and the elements of profit attributable to other factors. Vane v. The Fair, Inc., 676 F. Supp. 133, 137 (E.D. Tex. 1987), aff'd 849 F.2d 186 (5th Cir. 1988), cert. denied 488 U.S. 1008 (1989).

The Court concludes that no damages are available to Plaintiff on its copyright infringement claim. Defendants' motion for partial summary judgment on the issues of damages is granted.

D.    False Advertising

Plaintiff alleges that, in plagiarizing certain paragraphs from Plaintiff's website, Defendants falsely advertised that they were "a premier facility in the Southeast for the treatment of allergy, asthma, and immunologic diseases." Plaintiff contends that the undisputed facts demonstrate that Defendants had been in operation for only a few months and claim to have made no profit in 2008. Plaintiffs argue that Defendants' claim to be a "premier" facility was literally false under Section 43(a) of the Lanham Act.[20]

---

[20] Section 43(a) of the Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To prevail on a false advertising claim under this section, a plaintiff must establish: (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) injury as a result of the false advertising. Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002). However, once a court deems an advertisement to be literally false, evidence of consumer deception is not necessary. Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc., 185 F.3d 606, 614 (6th Cir. 1999). If court finds that the defendant's advertisement is literally false, the plaintiff still must establish materiality, Johnson & Johnson at 1250, that is, that "the defendant's deception is likely to influence the purchasing decision." Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002) (internal quotations omitted). A plaintiff may establish materiality by proving that "the defendants misrepresented an inherent

---

15 U.S.C. § 1125(a).

quality or characteristic of the product." <u>Nat'l Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d 841, 855 (2d Cir. 1997) (internal quotations omitted).[21]

      1.    *Analysis*

Plaintiff has not adduced evidence on each of the elements required to prove false advertising under the Lanham Act.[22] Its motion for summary judgment on that claim is required to be denied.

Defendants argue that, in describing themselves as "a premier facility in the Southeast for the treatment of allergy, asthma, and immunologic diseases," only the use of the word "premier" could be the basis for a claim of literally falsity. Defendants argue that such a word is vague and subjective and constitutes non-actionable puffing. The Court agrees. "'Puffing' is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under § 43(a)." <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d 1134, 1145 (9th Cir. 1997) (quoting 3 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 27.04[4][d] at 27-52 (3d ed.1994)).

Defendants' motion for summary judgment on Plaintiff's false advertising claim is granted.

---

[21] The materiality requirement is based on the premise that not all deceptions affect consumer decisions. <u>Johnson & Johnson</u>, 299 F.3d at 1250.

[22] Plaintiff offers no evidence that the alleged deception was material.

E.      Defendants' Motion to Strike

On November 13, 2009, Plaintiff filed an affidavit of Karen Porter supporting its motion for summary judgment. Porter states that on October 21, 2009, she mistakenly filled out Defendants' new patient forms and brought them with her to a scheduled appointment with Plaintiff. Plaintiff contends this is additional evidence of actual confusion.

Defendants argue that this filing was untimely because Plaintiff's motion for summary judgment was filed on July 27, 2009, and any supporting affidavits were required to be filed with that motion.

The Court has reviewed Ms. Porter's affidavit and considered it along with the other evidence of actual confusion that Plaintiff presented in its motion for summary judgment. The Court concludes that, with or without this new evidence, disputed issues of material fact exist on whether Plaintiff's mark acquired secondary meaning and whether Defendants' name is likely to cause confusion. Summary judgment is therefore inappropriate, and the Court need not reach the merits of Defendants' motion to exclude Plaintiff's new evidence. The motion is denied.

F.    Issues for Trial

Plaintiff's trademark infringement claim against Defendants remains

unresolved.  The issues for trial are:

1) Whether Plaintiff's mark, "Atlanta Allergy & Asthma Clinic," is valid
and protectable, that is, whether it has acquired secondary meaning; and

2) Whether Defendants' name, "Allergy & Asthma of Atlanta," infringes on
Plaintiff's mark, that is, whether Defendants' use of that name is likely to
cause confusion, or to cause mistake, or to deceive.

## III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff Atlanta Allergy and Asthma

Clinic, P.A.'s Amended Motion for Summary Judgment [83] is **GRANTED IN**

**PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant Allergy & Asthma of

Atlanta, LLC's ("Defendant") Motion for Partial Summary Judgment [91] is

**GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine to

Exclude Plaintiff's Evidence of a Consumer Survey [88] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine to

Exclude Dr. Kenneth L. Bernhardt as an Expert Witness for Plaintiff [89] is

**DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike Notice of Filing [133] is **DENIED**.

**SO ORDERED** this 19th day of January, 2010.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE